```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/13/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BEVERLY PENBERTHY,

                          Plaintiff,

           -v-

DONN A. CHICKERING,

                         Defendant.
------------------------------------------------------------X

15 Civ. 7613 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      Defendant Donn A. Chickering ("Chickering") moves under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings and for dismissal of the claims brought by his ex-wife, plaintiff Beverly Penberthy ("Penberthy"). Penberthy seeks a declaratory judgment that various debts owed to her by Chickering under a 1994 settlement agreement were not discharged by his intervening (2001–2004) bankruptcy proceeding. She also seeks injunctive relief requiring Chickering to buy and maintain life insurance in her favor, and seeks money damages in the amount of $958,666.63, reflecting the sum allegedly still owed to her under the settlement agreement. Chickering counters that Penberthy's claims must be dismissed because Penberthy, a creditor in the bankruptcy proceeding, agreed to the discharge, and because the bankruptcy court confirmed the discharge, such that her claims here are barred by the doctrines of issue preclusion and judicial estoppel.

      For the following reasons, the Court grants Chickering's motion for judgment on the pleadings.

I.      **Background and Procedural History**[1]

   A.    **The Parties' Settlement Agreement**

Penberthy and Chickering were once married to each other. Dkt. 1 ("Compl."), at 11. On February 2, 1994, in connection with their pending divorce action in the Supreme Court of New York for the County of New York, Penberthy and Chickering executed a Stipulation of Settlement (the "Settlement Agreement"). *Id.* at 12–13. The Settlement Agreement provided that (1) Chickering would immediately pay a "distributive award" to Penberthy in the amount of $1 million, (2) Penberthy would be awarded sole ownership of the marital residence in Rye, New York, plus two vehicles, (3) Chickering would maintain health insurance in favor of Penberthy for three years, and pay for any uninsured medical dental, or psychiatric expenses that Penberthy incurred during that time, unless Penberthy received free insurance from her employer, and (4) Chickering would pay Penberthy "as and for her support and maintenance,"[2] $83,333.33 per

---

[1] The Court's account of the underlying facts is drawn from Penberthy's Complaint ("Compl."), along with various documents it incorporates by reference, which Chickering attached as exhibits to his Answer, Dkt. 15 ("Ans."). These documents are properly considered in resolving the instant motion: "In considering a Rule 12(c) motion, 'a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.'" *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 500 (S.D.N.Y. 2011) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). The Court also draws from publicly-filed official documents from Chickering's bankruptcy proceeding, which the Complaint references and the Answer attaches. Solely for purposes of supplying context and background, the Court also recites undisputed historical facts noted in the parties' memoranda of law. These facts, however, did not bear on the Court's resolution of the Rule 12(c) motion.

[2] Notwithstanding this language, Chickering disputes whether this debt, in fact, constituted "support" or "maintenance" within the meaning of 11 U.S.C. § 523. *See* p. 13 n.8, *infra*.

month for a term of six years, totaling $6 million. *See* Dkt. 15, Ex. 1 ("Settlement Agreement") ¶¶ 6, 23, 25, 35–36.[3]

On July 25, 1994, Penberthy and Chickering were adjudged divorced. Compl. ¶ 25. The Settlement Agreement was incorporated into the Judgment of Divorce. Dkt. 15, Ex. 3 ("Judgement of Divorce").

B.     **Chickering's Bankruptcy Proceeding**

On October 25, 2001, Chickering filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). Compl. ¶ 34. In that proceeding, Chickering listed Penberthy as the holder of an undisputed non-priority unsecured claim, totaling $1 million, which Chickering represented was due to a "dissolution settlement (1994)." Dkt. 15, Ex. 5, at 3.

On June 25, 2002, Penberthy filed a Proof of Claim in Chickering's bankruptcy case for $1,297,716.33. Of this, she claimed that $1,047,716.33 was entitled to priority status, under 11 U.S.C. § 507(a)(7). Dkt. 15, Ex. 6 ("Proof of Claim") at 1. Of the $1,047,716.33 that her Proof of Claim asserted was entitled to priority status, Penberthy asserted that $916,666.63 was due to her under the Settlement Agreement. Proof of Claim at 2.

Chickering, however, disputed Penberthy's characterization of her claim as for priority debt. And when he converted his Chapter 7 bankruptcy proceeding into a Chapter 11 proceeding, he filed a proposed plan of reorganization that again classified Penberthy's claim as a non-priority, general unsecured claim.

---

[3] At the time of the divorce, the parties entered into other agreements, but in light of the parties' agreement to voluntarily dismiss several claims and to narrow the scope of this lawsuit, *see* Dkt. 35; page 6, *infra*, these agreements are not relevant here.

[3]

Significant here, on February 18, 2004, Chickering filed a second amended disclosure statement (the "Disclosure Statement"), which described his second amended plan of reorganization. It specifically addressed the treatment of priority unsecured claims under the plan, citing the Bankruptcy Code's requirement that any claims entitled to priority under 11 U.S.C. §§ 507(a)(3)–(a)(7),[4] be placed in separate classes within the plan. Dkt. 15, Ex. 7a ("Disclosure Statement"), at 22–33. The Disclosure Statement explained that the holders of such claims were entitled to priority treatment under the plan, and that they would then have the option either to accept or reject the plan. *Id.* The Disclosure Statement stated, however, that Chickering was "not aware of any claims that would qualify as Sections 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) priority unsecured claims under the Plan." *Id.* at 33. Consistent with that statement, the Disclosure Statement did not classify any claims in a priority class. *Id.* at 29–33. With regard to the treatment of general, non-priority, unsecured claims, the Disclosure Statement stated that such claims were "not entitled to priority under Bankruptcy Code Section 507(a)." *Id.*

As to Chickering's debts to Penberthy, the Disclosure Statement specifically classified these as "Class 4" general unsecured claims, which included them along with "[a]ll general unsecured claims . . . but excluding claim of Woodland Trucking [Company]."[5] *Id.* at 33–37. In

---

[4] For purposes of this decision, the Court treats the classification of a claim under § 523(a)(5) as identical—and interchangeable—with that under § 507(a)(7). *See In re Crosby*, 299 B.R. 679, 681 (Bankr. E.D. Va. 1998) ("Because the language of the two sections is identical, if the debt is non-dischargeable under section 523(a)(5) it receives priority status under section 507(a)(7)."); *Beaupied v. Chang (In re Chang)*, 163 F.3d 1138, 1142 (9th Cir. 1998) (explaining that "application of § 507(a)(7) should be coincidental with application of § 523(a)(5)").

[5] The Woodland Trucking debts were placed in a special "Class 5" category. *See* Disclosure Statement at 35–37.

[4]

Exhibit E to the Disclosure Statement, Chickering again listed Penberthy as a "Class 4" unsecured creditor. Dkt. 15, Ex. 7b, at 107.

The Disclosure Statement explained that confirmation of the proposed plan (*i.e.* the second amended plan) would discharge Chickering "to the fullest extent permitted by the Bankruptcy Code," from any debts and obligations incurred prior to the confirmation of that plan. Disclosure Statement at 63–64. It further stated that any creditors would be enjoined from bringing any legal action based on the discharged claims following the plan's confirmation. *Id.* at 64.

The Disclosure Statement was served on Penberthy and her counsel, who at the time was chairman of the bankruptcy practice group at the law firm then known as Dewey Ballentine LLC. Notwithstanding Penberthy's earlier designation of her debts as priority debts in her Proof of Claim, neither Penberthy nor her counsel objected to any aspect of the Disclosure Statement.

On April 16, 2004, the Bankruptcy Court approved the Disclosure Statement, as well as Chickering's proposed ballot form that creditors were supposed to use to vote on the plan proposed in the Disclosure Statement. Dkt. 15, Ex. 8. The court-approved ballot forms explicitly listed which class each creditor was in, and asked each creditor to vote to accept or reject the plan. Dkt. 15, Ex. 10.

On April 20, 2004, Chickering filed his Second Amended Chapter 11 Plan of Reorganization, Dkt. 15, Ex. 9 (the "Confirmed Plan," or the "Plan"). Mirroring the Disclosure Statement, the Plan stated that Chickering was "not aware of any claims that would qualify as Sections 507(a)(3), (a)(4), (a)(5), (a)(6), and (a)(7) priority unsecured claims under the Plan," and did not classify any claims in a priority class. *Id.* at 11. Also like the Disclosure Statement, the Plan defined general unsecured claims as "unsecured claims not entitled to priority under

Bankruptcy Code Section 507(a)," and it listed Chickering's debt to Penberthy as a general unsecured claim. *Id.* at 11–15. The Plan provided for general unsecured claims to be paid, *pro rata*, from receipts based on sales of coal by West Virginia Mid Vol, Inc., a non-debtor affiliate of Chickering's that operates a coal mine. Dkt. 15, Ex. 7a, at 33–34.

On May 5, 2004, Penberthy cast her ballot in favor of the Plan. Dkt. 15, Ex. 10. Penberthy's ballot stated that "The undersigned, a Class 4 (General Unsecured Claims) holder under the Plan hereby: ACCEPTS the Plan." *Id.* at 4. Penberthy once again did not in any way object to the Plan's classification her as an unsecured general creditor.

On June 8, 2004, the Bankruptcy Court issued an order confirming the Plan, Dkt. 15, Ex. 12, and finding that the Plan satisfied "[e]ach and every requirement of Section 1129(a) of the Bankruptcy Code necessary for confirmation," Dkt. 15, Ex. 11. Neither Penberthy nor any other creditor appealed the Bankruptcy Court's order confirming the Plan.

On January 26, 2005, the Bankruptcy Court closed Chickering's bankruptcy case. Dkt. 15, Ex. 12.

### C.    This Lawsuit

On September 25, 2015, 11 years after the Plan's confirmation, Penberthy filed the Complaint in this case. Dkt. 1 ("Compl."). The Complaint alleges that the Confirmed Plan had not properly discharged various debts that Chickering owed to Penberthy under the Settlement Agreement and that those debts had not been paid as of the Plan's confirmation. Relevant here, these included $916,666.63, representing the outstanding principal balance of the "maintenance and support" obligations under the Settlement Agreement; and $42,000, representing medical expenses incurred by Penberthy. Compl. ¶¶ 37–38. On this theory, the Complaint sought injunctive and declaratory relief and money damages.

On April 21, 2016, Chickering answered the Complaint, Dkt. 15, moved for judgment on the pleadings and dismissal, Dkt. 17, and filed a memorandum of law, Dkt. 19 ("Def. Br."), and declaration, Dkt. 18, in support. On May 12, 2016, Penberthy filed a memorandum of law in opposition. Dkt. 23 ("Pl. Br."). On May 19, 2016, Chickering filed a reply. Dkt. 24 ("Def. Rep. Br."). On May 25, 2016, the Court heard argument. On June 7, 2016, Chickering, with leave from the Court, Dkt. 31, filed a supplemental memorandum of law in support of his motion, Dkt. 33 ("Def. Supp. Br."), and on June 13, 2016, Penberthy filed a supplemental memorandum of law in opposition. Dkt. 34 ("Pl. Supp. Br."). On June 14, 2016, the parties jointly filed a stipulation of partial dismissal, voluntarily disposing of Penberthy's claims, other than those based on her claims to still be owed, under the Settlement Agreement, $916,666.63 in unpaid support and maintenance and $42,000 in reimbursement for medical expenses. Dkt. 35.

## II.   Applicable Legal Standards

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors)*, 550 F.3d 240, 243 n.4 (2d Cir. 2008) (citing *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)); *see also United States Life Ins. Co. v. Blum*, 09 Civ. 9416, 2011 U.S. Dist. LEXIS 1531, at *10 (S.D.N.Y. Jan. 3, 2011). The Court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in her favor. *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). To survive a motion for judgment on the pleadings, the Complaint must contain factual allegations amounting to "more than an unadorned, the-defendant-unlawfully-harmed me accusation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), such that those allegations, when accepted as true, "state a claim for relief that is

*plausible on its face." South Cherry Street LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (emphasis in original).

### III.   Discussion

Penberthy seeks a declaratory judgment to the effect that her claims for $916,666.63 in outstanding principal for "maintenance and support" and for $42,000 in unpaid insurance under the Settlement Agreement are not dischargeable. She seeks money judgments in satisfaction of those claims, plus interest. Her essential claim is (1) because 11 U.S.C. § 1141(d)(2) provides that a discharge under chapter 11 does not discharge debts excepted under § 11 U.S.C. § 523, and (2) because domestic support obligations are excepted under § 523(a)(5), Chickering's obligations to her under the Settlement Agreement were not discharged by the Bankruptcy Court's order approving the Confirmed Plan.

In moving for dismissal under Rule 12(c), Chickering makes three arguments. First, he argues, Penberthy's claim here is barred by issue preclusion. The Bankruptcy Court's approval of the Confirmed Plan, following a process in which Penberthy's participated, resolves the question as to whether the debts that Penberthy claims under the Settlement Agreement were domestic support obligations that are excepted under § 523(a)(5). Second, he argues, Penberthy's claims here are barred by the doctrine of judicial estoppel, given her vote in favor of the Confirmed Plan. Third, Chickering argues, on the merits, as an original matter, that the debts at issue in this case do not qualify as "domestic support obligations" under § 523(a)(5). The Court agrees with Chickering on the first two arguments and therefore has no occasion to reach the third.

### A.   Issue Preclusion

Chickering's first argument is that his Confirmed Plan is a final judgment on the merits as to whether the money he owed to Penberthy under the Settlement Agreement was covered by § 523(a)(5)—and therefore not dischargeable—so that Penberthy's current claims are barred by the doctrine of *res judicata*.

As a matter of law, a judicial order confirming a bankruptcy plan is a "final judgment on the merits" for the purpose of issue preclusion, insofar as a party in a separate proceeding later seeks to litigate an issue that could have been, or actually was, decided by the plan. In *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010), for example, the United States Supreme Court held that "[an] order [from the Bankruptcy Court] confirming [the defendant's] proposed [bankruptcy] plan was a final judgment." Similarly, in *Celli v. First Nat'l Bank of N. New York (In re Layo)*, 460 F.3d 289, 293 (2d Cir. 2006), the Second Circuit held that a judicial order confirming a bankruptcy plan, like the Confirmed Plan here, "represented a binding determination of the rights and liabilities of the parties as ordained by the plan," and therefore that such a plan "was a[n issue-preclusive] final judgment on the merits."

Moreover, the federal bankruptcy statute has yet broader preclusive effect. Section 1141(a) of Title 11 provides that "the provisions of a confirmed plan bind . . . any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan." Applying this provision, the Second Circuit has held that a "confirmation order serves as *res judicata* as to any issues that were or could have been raised in the confirmation proceedings," and that "[t]he provisions of a confirmed Chapter 11 reorganization plan bind each and every creditor, regardless of whether the plan impairs the creditor's claim, and regardless of whether the creditor accepted the plan." *In re Bel Air Square Joint Venture*, 100 F.3d 942 (2d Cir. 1996)

The confirmation of a bankruptcy plan therefore bars relitigation not only of *claims* which were, or could have been, brought and resolved at the point of confirmation. It also precludes relitigation of any *issues* which could there have been resolved. The United States Court of Appeals for the Sixth Circuit has helpfully explained this aspect of bankruptcy law:

> Although the courts often invoke the term "res judicata" in describing the § 1327(a) bar to relitigation, it should be recognized that this statutorily derived bar equates to neither traditional claim preclusion nor traditional issue preclusion. . . . In cases in which a party . . . appeals a discharge . . . there is no identity of claims, and claim preclusion is not appropriate. Unlike claim preclusion, § 1327 does not bar the entire action. Preclusion under § 1327 is somewhat harsher than common law issue preclusion, however. At common law the litigation of an issue is precluded only if that issue was actually litigated and decided. . . . Under § 1327, as it has been interpreted, an issue is precluded if it *could have been decided* at confirmation, whether or not it was actually decided. This court has held that the analogous provision of Chapter 11, § 1141, 'bars relitigation of any issues raised or that could have been raised in the confirmation proceedings.'. . . . [W]e believe that the language of § 1327 and the need for finality in the multilateral bankruptcy context similarly bar the introduction of issues that could have been raised at confirmation. Utilizing the more relaxed common law issue preclusion standard, by comparison, would allow certain creditors to raise claims against the bankruptcy estate collaterally that could and should have been raised in the confirmation process, but were not actually litigated or decided at that stage. Such a result would be contrary to the design and intent of the Bankruptcy Code.

*Cline v. Welch (In re Welch)*, No. 97-5080, 1998 WL 773999 (6th Cir. Oct. 11, 1998).

Under this authority, Penberthy's claims are barred. Chickering's debts to Penberthy under the Settlement Agreement, including both the $916,666.63 in outstanding principal and the $42,000 in unpaid health insurance, not only could have been, but actually *were* decided by the Bankruptcy Court in confirming the Plan. The Confirmed Plan states that Chickering was unaware of any "claims that would qualify as Sections 507[] . . . (a)(7) priority unsecured claims," and thus effectively determined that no such claims existed. And the Plan explicitly stated that Penberthy's claims under it were "not entitled to priority under . . . 507(a)."[6]

---

[6] Admittedly, Penberthy's claims under the Plan at the time included the $916,666.63 sum at issue here, but not the $42,000 sum. However, in light of the Confirmed Plan's conclusive

Notably, too, where a bankruptcy court has determined that the cumulative value of a certain class of debt is zero, as is so here with respect to priority debt under § 523, that serves as an issue-preclusive determination that no such claims exist. *See In re Hann*, 476 B.R. 344, 347 (B.A.P. 1st Cir. 2012), *aff'd*, 711 F.3d 235 (1st Cir. 2013). The Confirmed Plan therefore precludes Penberthy from making the contrary claim here.

Resisting this conclusion, Penberthy, in her brief, argued that 11 U.S.C. § 1141(d)(2) blocks—in her words, makes "impotent"—a Plan from discharging a creditor spouse's support and maintenance claim covered by § 523. On the premise that Chickering's debts to her under their Settlement Agreement were non-dischargeable marital support obligations, she argues, he cannot invoke § 1141 to block her from pursuing them. *See* Pl. Br. at 11.

Penberthy, however, misapprehends Chickering's argument. Section 1141(d)(2) does indeed provide that confirmation of a plan "does not discharge an individual debtor from any debt exempted from discharge under section 523 of this title." Therefore, had the Plan purported to discharge support payments covered under § 523, it would indeed likely have been powerless to do so, because such payments are non-dischargeable. But that is not the basis of Chickering's claim of *res judicata*. His claim is that the Plan determined, conclusively, as a factual matter, that the debts owed by Chickering to Penberthy were *not of the sort covered by § 523*, and therefore were dischargeable (and ultimately discharged) non-priority debts. Put differently, the preclusive effect of the Confirmed Plan follows from its factual classification of the debts as of a non-support, non-priority nature, not from an errant legal conclusion (for it made none) that support payments covered by § 523 are legally dischargeable.

---

determination that there were no debts entitled to priority, Penberthy's current claim for the $42,000 in reimbursements is barred by the doctrine of issue preclusion.

[11]

Perhaps recognizing the futility of this claim, Penberthy, in her reply brief and at argument, *see, e.g.,* 05/25/16 Tr. 52, made a different argument. She argued that even if the Bankruptcy Court's confirmation of the Plan treated Chickering's debts as non-priority debt, that the Plan's treatment of the debt does not bear on its dischargeability. As the case law above reflects, that is simply not so. And in various cases, the classification of a debt for the purposes of determining priority of payments has been also to control the issue of dischargeability. *See, e.g., In re Smith*, 586 F.3d 69, 75 (1st Cir. 2009) (classification of a debt as not a support claim for purpose of priority treatment established too, under § 523, that it "is a general unsecured claim not entitled to priority status and can be discharged in [. . .] bankruptcy"); *Coon v. Henderson (In re Coon)*, 522 B .R. 357, 364 (Bankr. M.D. Ala. 2014) (holding that, because claim at issue "is not in the nature of liability and not entitled to § 507(a)(1)[7] priority, it follows that there is no basis to except it from discharge"); *In re Jones*, No. 10-80478, 2010 WL4008155, at *2 n.1 (Bankr. W.D. La. Oct. 12, 2010) (stating that, "[w]hile the narrow issue before this Court is whether the debt . . . should be treated as a priority claim under § 507(a)(1), this Court is not unmindful of the practical effect of the classification of the debt" on its dischargeability).

The Court accordingly holds that the confirmed bankruptcy Plan establishes, as a matter of *res judicata*, that Penberthy's claims against Chickering under the Settlement Agreement for $916,666.63 and $42,000 were successfully discharged in bankruptcy. Because Penberthy's claims here all depend on the incorrect premise that these debts survived Chickering's bankruptcy, her claims must be dismissed under Rule 12(c).[8]

---

[7] At the time of Chickering's bankruptcy, the analogous provision to § 523(a)(5) was § 507(a)(7).

[8] Although the Court has no occasion to resolve, as an original matter, whether the payments at issue in fact qualified as support payments under § 523(a)(5), the parties' briefs make clear that

### B. Estoppel

Chickering separately seeks dismissal under Rule 12(c) based on the doctrine of judicial estoppel. That argument, too, is meritorious.

Although there is no single test for how to apply the doctrine of judicial estoppel, the Second Circuit has held that the doctrine typically applies where "1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quotation marks and citation omitted). Importantly, the former position of the party against whom estoppel is sought need not have been the "'but for' caus[e]" of the earlier court's determination, so long as allowing that party to change positions would yield some unfair burden or benefit. *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013).

Those elements are met here by Penberthy's affirmative acceptance of the Confirmed Plan in 2004.

First, by voting to accept the Plan, Penberthy necessarily took the position that the Confirmed Plan correctly classified her as a non-priority creditor (*i.e.*, one without any priority debts). That position is flatly inconsistent with Penberthy's position in this lawsuit, in which she

---

each side had colorable arguments on this issue. Chickering, for example, noted that, under the Settlement Agreement, his obligations to Penberthy did not terminate upon her death, as might ordinarily be the case with respect of a support or maintenance obligations. *See Brody v. Brody (In re Brody)*, 3 F.3d 35, 38 (2d Cir. 1993) (for purpose of determining whether a debt qualifies as a "support" payment, "the label . . . the parties attach to a payment is not dispositive"; the court instead is to consider "[a]ll evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent"); *Carlin-Blume v. Carlin*, 314 B.R. 286, 292 (S.D.N.Y. 2004) (factors relevant to parties' subjective intent is "whether the obligation terminates on the death or remarriage of either spouse"). Penberthy is therefore wrong to claim that giving *res judicata* effect to the Plan's treatment of these debts would replicate an obvious error in the Plan.

[13]

seeks injunctive relief and monetary damages based on the claim that the debts owed to her by Chickering, were, non-dischargeable priority debts under § 523. The ballot that Penberthy signed in support of the Confirmed Plan explicitly referred to her as "[t]he undersigned, a Class 4 (General Unsecured Claims) holder." Dkt. 15, Ex. 10. And Penberthy voted as part of a class denominated as "Class 4" non-priority general unsecured creditors. *See* 11 U.S.C. § 1126(c) (setting forth "class-by-class" nature of plan voting). Furthermore, Penberthy was represented by estimable counsel in Chickering's bankruptcy. There is no basis to view her acquiescence to the Plan's characterization as uninformed or non-volitional.

In denying that her present theory is inconsistent with her position at the time of the Plan's confirmation, Penberthy reprises her argument—made in her opposition to Chickering's *res judicata* argument—that § 1141(d)(2)'s exemption from discharge trumps the Plan's treatment of her claims, even if she endorsed that treatment. *See* Pl. Br. at 11. For this proposition, Penberthy relies on *In re Talsma*, 496 B.R. 828 (Bankr. N.D. Tex. 2013) ("*Talsma*"). The bankruptcy court there held that a creditor's vote in favor of a bankruptcy plan that partially disallowed the creditor's support claim should not be construed as a vote in favor of discharging that disallowed portion of her debt, but merely as a vote for "the allowed portion of her Claim to be paid under the Plan and to maintain her rights as to the disallowed portion." *Talsma*, at 841. On this basis, the bankruptcy court reasoned, the creditor's vote "was not 'plainly inconsistent'" with her position that the disallowed debt survived. *Id.* at 841.

*Talsma*, however, is not controlling here. It is also inapposite. The *Talsma* court took the view that to find dischargeability based on the Plan, the bankruptcy court would have had to have "exceed[ed] its jurisdiction." 469 B.R. at 841. But as Chickering points out, the Supreme Court's decision in *Espinosa* casts serious doubt on the premise that a bankruptcy court that

treats a confirmed Plan's treatment of a debt as preclusive of future litigation regarding the classification of that debt in other contexts thereby exceeds its jurisdiction. *See* 559 U.S. at 269. And while the circumstances of the vote in *Talsma* required the bankruptcy court to undertake a "reasonable interpretation" of the creditor spouse's vote for the bankruptcy plan in that case, *see Talsma* at 841, here, there is no way logically to square Penberthy's approval of the Confirmed Plan with her current claim that it incorrectly classified Chickering's debts as non-priority, non-support payments. Tellingly, Penberthy does not offer any "alternative interpretation" of her voting in favor of the Plan.[9] The first *DeRosa* element therefore is satisfied.

Second, the bankruptcy court, in confirming the Plan, *a fortiori* adopted Penberthy's position that her debts were non-priority claims that fell outside the protections of § 523. The second *DeRosa* element is, therefore, satisfied as well.

Finally, as to the third *DeRosa* element, the Court finds that it would unfairly prejudice Chickering to allow Penberthy, many years later, now to pursue her claims on the theory that the Confirmed Plan did not discharge Penberthy's debts to her under the Settlement Agreement. A finding of unfair detriment is not strictly required: While this last element is "is sometimes couched in terms of unfair detriment [to] the opposing party [seeking estoppel]," *Adelphia Recovery Tr. v. HSBC Bank USA, Nat'l Assoc. (In re Adelphia Recovery Tr.)* ("*Adelphia I*"), 634 F.3d 678, 696 (2d Cir. 2011) (internal quotation marks and citation omitted), such a showing is "not required . . . in all circumstances." *Adelphia Recovery Tr. v. Goldman, Sachs & Co.* ("*Adelphia II*"), 748 F.3d 110, 116 (2d Cir. 2014) (collecting cases). Here, however, that

---

[9] Penberthy does not claim her vote for the Plan was unwitting. And any such claim would be problematic, given that she (1) had the assistance of highly able counsel, and (2) was demonstrably aware of the possibility of an alternative classification, having taken the position in her Proof of Claim that Chickering's debts under the Settlement Agreement warranted priority status.

showing is met, as permitting this suit to proceed would expose Chickering to a judgment (including interest) of nearly $2 million than owed under the terms of the Confirmed Plan. And Penberthy, for her part, does not articulate any solid reason for waiting until late 2015 to pursue this claim.

Accordingly, Penberthy's claims in this case are barred not only by issue preclusion, but also under the doctrine of judicial estoppel.

## CONCLUSION

For the foregoing reasons, Chickering's motion for judgment on the pleadings is granted. The Clerk of Court is directed to terminate the motion at docket number 17, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: January 13, 2017
         New York, New York